465 So.2d 1025 (1985)
Troy WATSON
v.
STATE of Mississippi.
No. 55434.
Supreme Court of Mississippi.
February 27, 1985.
Rehearing Denied April 10, 1985.
*1026 James G. Tucker, III, Cook & Tucker, Bay St. Louis, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Catherine Walker Underwood, Asst. Atty. Gen., Jackson, for appellee.
Before WALKER, P.J., and HAWKINS and ROBERTSON, JJ.
HAWKINS, Justice, for the Court:
Troy Watson appeals from his conviction of aggravated assault in the Circuit Court of Hancock County and sentence to twenty years.
The issues we address on this appeal are the sufficiency of the evidence to convict, and the refusal of the circuit judge to grant a mistrial because two witnesses not under subpoena by either the state or defense left Mississippi shortly prior to trial to keep from testifying. Finding no error, we affirm.

FACTS
Watson, unemployed and 47 years of age, lived in a house trailer in Bay St. Louis. Around noon on a Wednesday, January 5, 1983, David Brewer, a 22-year-old acquaintance of Watson's, came to Watson's trailer. With Brewer were his wife's brother, Johnny Lyarly, and Johnny's cousin or nephew, David Lyarly. Johnny was 20, David 17 years of age. Also in the trailer that afternoon was Steve Rutherford, a friend of Watson's who Brewer met that day. The group sat around the trailer that day drinking. Around 3:30 or 4:00 o'clock that afternoon, Brewer and the Lyarlys left to work on some woman's car at a local service station. They returned and the drinking continued. Beer and Jack Daniels whiskey were consumed.
According to Brewer, Rutherford accused him of stealing Quaalude pills belonging to Watson, which Brewer denied. The two of them got into a fight, Rutherford *1027 hitting Brewer with a chair. When the fight started, the Lyarlys left. The fight subsided, but apparently the argument did not. Another scuffle with Rutherford started, Brewer wound up on the floor. According to Brewer, when he got up off the floor, Watson rammed a shotgun in his face and shot him.
According to Thomas E. Jennings, a deputy sheriff, the missile entered the side of Brewer's mouth and came out behind his ear.
Watson testified that after Brewer and the Lyarlys arrived, Brewer knocked two ash trays on his table and he asked Brewer to respect his home. Nothing eventful transpired, however, until Rutherford, who was asleep in the trailer when the young men were first there, woke when they came back. Rutherford and Brewer got into an argument, and according to Watson, Brewer tried to hit Rutherford with a chair, and Rutherford grabbed Brewer and held him on the floor.
Watson said he asked Brewer and the Lyarlys to please leave three or four times. He said they went to the door and he thought they had left. Further, that he was preparing supper for himself and Rutherford, and while he was sitting there drinking a cup of coffee, he looked up and saw Brewer standing by the bar in the trailer.
Then, Watson said he heard a shot and saw Brewer fall forward, knock a cupboard door closed, and heard him shout that he had been shot.
Watson and Rutherford tried to minister to Brewer.
When Deputy Sheriff Jennings arrived shortly after 6:00 p.m., he saw Brewer on the floor and Watson and Rutherford wiping him with a towel. Johnny Lyarly was in a car out front, which had two 30-30 rifles, one in the back and one in the front, as well as a.32 caliber revolver in it. Johnny Lyarly told the officer he wanted to get a gun and go back in the trailer to kill Mr. Watson.
Alvin Ladner, another deputy sheriff, arrived at the trailer around 7:00 p.m. He asked Brewer who had shot him, and Brewer replied, "Troy."
Prior to the shooting, the men had been seated around the kitchen table. On the table were two .410 shotgun shells. There were pellets embedded in the trailer. Outside the trailer the officers found a .410 shotgun with one spent shell inside the chamber, and another shotgun. These weapons were about 75 feet from the trailer and 25 feet apart.
The trailer had a front and a back door. Ladner said Watson told him he was sitting at the kitchen table in a chair at the end of the hallway, and that an unidentified person walked down the hallway into the kitchen area and shot Brewer, and left. Watson furnished the officer no description of any kind of the assailant.

TRIAL PROCEEDINGS
On the morning of the trial, both sides announced ready. After the jury was selected, in chambers defense counsel made a motion for the rule to be envoked. The mother of Brewer was in chambers with Brewer and the attorneys.
Neither Rutherford nor either of the Lyarlys were under subpoena for either the state or the defense. None of these witnesses were listed as state witnesses on the indictment. On March 4, 1983, defense counsel made a discovery motion, asking inter alia for the names of all state witnesses. The discovery motion was sustained by court order on April 6. Trial began April 15, 1983. In the colloquy in chambers, defense counsel acknowledged he had been given the names of the Lyarlys, which the day before he had decided were essential to his case. He then stated on the evening before trial he had listened to some tapes furnished him by the Sheriff's Office.
No subpoena is in the record. The only information as to any subpoena, served or not, is what counsel stated to the court. Mrs. Balco, the mother of Brewer, informed the court that Brewer's father-in-law *1028 had the day previous taken both the boys to Florida.
The trial record reveals the following:
MR. FRISBIE:
And, therefore, I'm going to have to move for a mistrial; not because I want to, because there is [sic] witnesses which I feel are essential, and I'll be glad to take it up with the Court in detail, if necessary. We have the tapes and stuff. And they were not subpoenaed in advance, particularly by the State, and the State couldn't get them, and that's when I found out they are not going to be here. And I'm sorry to bring it up at this time, but we didn't know who was going to show up this morning.
THE COURT:
That's all right. Are you telling me that the father of one of those boys who were witnesses took them to Florida so they couldn't testify?
MRS. BALCO:
They went to Florida yesterday.
THE COURT:
Where in Florida?
MRS. BALCO:
I have no idea.
THE COURT:
For how long?
MRS. BALCO:
I don't know that either. We didn't know until my son tried calling them last night, tried to call his daddy-in-law last night.
THE COURT:
What is your name, ma'am?
MRS. BALCO:
Bobby Balco (spelled phonetically). I'm David's mother.
THE COURT:
The victim's mother. Do you know anything about this, Sonny?
MR. JOHNSON:
The only thing I know, Judge, is that there were several people in and out of the trailer. I've got some brief comments in here in the file that do not give me any indication that they could contribute anything material to this case. I don't have any statement in here from them or anything of that nature. From what I understand from the victim, is that they were not present when the actual shooting took place. It kind of  when the fight started, they all scattered like a covey of quail. I think the testimony will show that the only person present  wait a minute. Let me talk to Alvin before I make this next statement. Make sure I'm right.
(Pause)
MR. JOHNSON:
All right. My analysis was correct. There were several people in the trailer in the beginning. And Mr. Frisbie is correct, that the names of the people he told the Court, I have forgotten were there, they had been there several hours, people in and out several hours, sitting around talking about hunting and things of that nature. Just a general conversation. A Steve Rutherford, the victim, and the Defendant Troy Watson, were in the trailer when the victim and Rutherford got into an altercation. They got into a fight; when the fight started, everybody scattered. During the course of the fight, it's alleged that the Defendant Watson obtained a shotgun, stuck it into the face of the victim and shot him. So, when the shooting took place, my information is that there were three people in the trailer; the victim, Steve Rutherford, and the Defendant Troy Watson. Everybody else had absent [sic] themselves, took off. Now, I do not have Steve Rutherford; he's gone.
THE COURT:
Where is he?
MR. JOHNSON:
I have no idea. He was not charged. And shortly after the incident, he left.
MR. FRISBIE:
If the Court please, I think Steve Rutherford was charged, and they've got pictures of him in there, bundle of pictures *1029 of a lineup shot down here. I think he was charged at one point as an accessory after the fact or something, and no longer around and not available, and apparently not subject to the Court. The Lyarlys, they have a tape which I listened to, on a complete statement by Mr. Brewer and a John Lyarly, and their indications in the tape and stuff that the story one party may tell won't jive with the party that another one might tell, and I desperately need the Lyarly boys who were definitely removed to be prevented from being subpoenaed in this Court today. And I'll show out of the record that Lyarly was not even  they didn't go after him until yesterday. The State did not subpoena him until yesterday. And I wrote a letter late last night and delivered first thing this morning and double checked that they had taken off. And those subpoenas didn't go out until yesterday on this case, and then I didn't learn about these names and stuff until yesterday evening, and I think it's unfair to me to learn about the case and develop a theory and need the witnesses and find that the rug's been pulled out. I'm not accusing the State or any official or anybody, but this lady says they were hauled out so they wouldn't testify by members of somebody's family, when has nothing to do with the Sheriff's office or the District Attorney's office; but that puts us in an unfair position, and a position to say that I think we are entitled to a mistrial at this point.
[Vol. I, pp. 16-19]
In the statements made by counsel to the court, it appears the state belately issued a subpoena for the Lyarlys which was not served. The night before trial defense counsel learned the subpoenas had not been served, and defense counsel had the clerk issue defense subpoenas the morning of the trial.
In chambers defense counsel did not ask for a continuance, but moved for a mistrial. The most defense counsel could allege about their testimony was that it would show discrepancies in the state's case.
The circuit judge ruled the defense counsel had not shown him where any of the Lyarlys' testimony was material to the shooting, both were outside the trailer when it occurred, and therefore overruled the motion. The court further stated that if during trial it developed that their testimony might be material, he would reconsider his ruling, and at that time declare a mistrial.
No further motion was made by defense counsel during trial as to the missing witnesses.
Defense counsel never made any effort to get Rutherford, who was an eyewitness to the shooting, and makes no point about his being missing.
During the trial some defense witnesses, who were neighbors of Watson's, testified to hearing four shots from the direction of the trailer. Two of them recall hearing an argument in the trailer and breaking of glass or furniture. Some of the defense witnesses had been threatened by Watson previously, and one of the witnesses said Watson was "trigger happy."

LAW

WEIGHT OF THE EVIDENCE
Watson first argues the sufficiency of the evidence to convict. The jury had the testimony of Brewer and Watson. Brewer's testimony was positive and unequivocal. Further, there in the trailer when the officer asked him who shot him, Brewer replied, "Troy." In this record the only remarkable fact as to Brewer was that he was not killed, being shot in the face at such close range by a shotgun. The record does not reveal how seriously he was wounded, however, or how many pellets struck him.
Watson's statement to the officer is incredible. To claim a person walked into the trailer, shot Brewer with Watson's shotgun and then left, and yet be unable to give any clue as to his identity is manifestly strange.
*1030 We must conclude this was a classic jury issue on the weight of the evidence, which we have no right to disturb. In Whittington v. State, 377 So.2d 927, p. 929 (Miss. 1979), we stated:
We have often stated that conflicts in the evidence, its strengths or weaknesses, are for the jury's consideration. It is the sole judge of the weight and worth of testimony and has a duty to determine the evidence it will accept as true or that which it should reject as untrue.
The first officer who arrived was Jennings. He saw Brewer on the floor, appearing to be in a lot of pain. Jennings testified:
I asked him what had happened, and he said they didn't know, that somebody shot the man; so I called for Mobile Medic and an investigator. [Emphasis added] [Vol. I, pp. 42-43]
We cannot agree with Watson's contention on appeal that the above testimony by Jennings discredited Brewer's testimony as to the identity of his assailant, and required the jury to accept Watson's version. In the first place the answer is ambiguous, susceptible to more than one interpretation. In the second place, even if it were unequivocal, a jury issue was still clearly presented upon the conflicting evidence.
The mere fact there is an even balance of one prosecuting witness for the state and one defense witness for the defense, the defendant, does not prevent the jury from weighing the credibility of each, and deciding the issue. Leflore v. State, 439 So.2d 675 (Miss. 1983); Gray v. State, 389 So.2d 1384 (Miss. 1980); Hester v. State, 240 Miss. 369, 127 So.2d 430 (1961); and Jones v. State, 223 Miss. 809, 79 So.2d 262 (1955).

REFUSAL TO GRANT MISTRIAL
Watson's trial counsel, from consultation with Watson, is bound to have known both the Lyarlys were possible witnesses. Yet no effort was made to subpoena them until the morning of trial, and the decision to issue defense subpoenas for them, according to defense counsel himself, was not made until the night before trial.
Defense counsel did not need the state to inform him as to who was present at Watson's trailer that day. His client could have furnished him with that information. Moreover, he was furnished the Lyarlys' names by the state.
When the court called this case for trial on the morning of April 15, 1983, both the state and the defense announced ready.
Then, about an hour later, following the impanelling of the jury, the record reveals defense asking for a mistrial because of the absence of the Lyarlys, neither of whom was under a subpoena.
There is nothing in this record to support the circuit judge's granting a mistrial. Nor, even though it was never requested, was there basis for a continuance. See: Miss. Code Ann. § 99-15-29; see: McLendon v. State, 335 So.2d 887 (Miss. 1976); Herring v. State, 374 So.2d 784, p. 789 (Miss. 1979). It is also significant that the refusal of the circuit judge to grant a mistrial was never mentioned again during the course of the trial, the circuit judge was never asked to reconsider his ruling, and the refusal of the court to grant a mistrial was not even assigned as error in the motion for a new trial.
It is likewise strange that the Lyarlys were so important to the defense on the morning of trial, yet no complaint is ever made about the absence of Rutherford, the eyewitness to the shooting.

INSTRUCTIONS
The record reveals the court issued one instruction on the degree of proof, and granted another instruction for the state. These instructions are as follows:
INSTRUCTION C-13
The law presumes every person charged with the commission of a crime to be innocent. This presumption places upon the State of Mississippi the burden of proving the Defendant guilty of every material element of the crime with which he is charged. Before you can return a *1031 verdict of guilty, the State must prove that the Defendant is guilty beyond a reasonable doubt. The Defendant is not required to prove his innocence. [Vol. II, R. 159]
INSTRUCTION S-1
The court instructs the jury that if you believe from the evidence beyond a reasonable doubt that the Defendant, Troy Watson, did on or about the time and date testified about, in Hancock County, Mississippi, did unlawfully, willfully and feloniously commit an assault on another, to wit: David Brewer and purposely or knowingly cause bodily injury to the said David Brewer with a deadly weapon, to wit: a.410 shot gun, by shooting the said David Brewer in the face, a means likely to produce death or serious bodily injury, then if you believe from the evidence in this case, beyond a reasonable doubt, the Defendant, Troy Watson, is guilty of aggravated assault, and you should say so by your verdict. [Vol. II, R. 162]
This circuit judge refused requested Instruction D-4:
INSTRUCTION D-4
The Court instructs the jury that in order for the State to meet the burden of proving the Defendant guilty beyond a reasonable doubt, the State must prove each and every essential element of the offense charged, and before the jury can convict the Defendant, they must be convinced of each and every essential element beyond a reasonable doubt. [Vol. II, R. 166]
The court declined to grant Instruction D-4 because it had been covered by other instructions.
We do not agree with the circuit judge that instructions C-13 and S-1 clearly instruct the jury that the burden is upon the state to prove each and every essential element of the offense charged beyond a reasonable doubt. A defendant is entitled to have the jury clearly instructed that the state has such burden. On the other hand, we believe that the instructions granted in this trial make this burden apparent, although it should be more clearly stated. It is, of course, elementary that the state has this burden. See: Neal v. State, 451 So.2d 743 at 757 (Miss. 1984).
Instructions on the burden of proof should clearly and unequivocally inform the jury that the state is required to prove beyond a reasonable doubt each and every essential element of the offense. Yet, in this case we do not believe the instructions granted were so lacking in this respect that the jury could have been mislead into thinking otherwise. Reversible error was not committed in refusing to grant Instruction D-4.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.