493 So.2d 331 (1986)
The CITY OF CLINTON, Mississippi, Dickey King, Lamar Goff and Tom Box
v.
C.E. SMITH.
No. 56642.
Supreme Court of Mississippi.
August 6, 1986.
*332 Jerry L. Mills, Melton E. Knotts, Jr., Pyle, Harris, Dreher, Mills & Woods, Jacqueline Smith Pierce, Jackson, for appellant.
William B. Kirksey, Bobby B. DeLaughter, Kirksey & DeLaughter, Jackson, for appellee.
Before PATTERSON, C.J., and HAWKINS and ROBERTSON, JJ.
ROBERTSON, Justice, for the Court:

I.
At issue today is whether the people of the City of Clinton, Mississippi, have taken steps legally adequate to ban the sale of beer in their community. In a June 1985 referendum election, 52.5 percent of those casting ballots voted, "No," that the sale of beer should be made illegal. The Circuit Court of Hinds County subsequently voided the election by reason of "irregularities" found to have existed in "the calling for a beer sales referendum... and in the subsequent voting upon that issue". In substantial part, we affirm.

II.
The controversy surrounding the sale of beer in the City of Clinton, Mississippi has raged for some time. It appears to have been augmented by a recent annexation[1] which brought within the City's jurisdiction a number of business establishments which theretofore had offered canned and bottled beer for sale under relatively lenient restrictions.
The sale of beer was a regular subject of discussion between the Clinton's Mayor and Board of Aldermen for the latter part of 1984. An ad hoc committee studied the controversy. Its work appears to have given impetus to efforts to call a citywide referendum on the issue. A moratorium was approved by the Mayor and Board regarding enforcement of the old ordinance and that moratorium was extended well into 1985.
On January 15, 1985, Rev. Don Edwards presented to the Mayor and Board petitions calling for a referendum on the sale of beer and asking an election regarding the matter. The petitions purportedly contained the signatures of more than two thousand citizens of Clinton. State law requires 20 percent of a municipality's registered voters *333 before a beer referendum may be called. Miss. Code Ann. § 67-3-9 (1972).
In due course, the city clerk ascertained that 1,512 of the names on the petitions were those of registered voters. As Clinton then had 8,190 registered voters, the petitions were 126 names short of the statutorily required 20 percent. The clerk reported this fact to the Mayor and Board at its regular February 5, 1985 meeting.
It was obviously known in advance that the petitions were short 126 names, for Rev. Edwards appeared at the February 5 meeting and urged that, before final action was taken by the Mayor and Board on the question of whether the petitions were sufficient to call an election, two additional steps be taken: First, that the petitioners be allowed to submit the names of additional registered voters and, second, that the voter registration roles for the City be purged to remove the names of persons who had died or moved away. After some discussion the Mayor and Board authorized the city attorney to request an opinion of the Attorney General of the State of Mississippi regarding its authority in each of these two areas.
On February 19, 1985, the Attorney General responded to the first question:
It is the opinion of this office that once the governing board rules that a petition for an election is insufficient, no supplemental signatures may be added to the original petition... . However, if the petition in question has not yet been adjudged insufficient by the governing board, municipal electors may add their names to said petition up to the time such adjudication is made.
In response to the question regarding the purging of the voter registration roles, the Attorney General advised
That a voter's name may be removed from the registration and poll books only by act of the Municipal Election Commission at one of their regular meetings on dates which are set by statute.
Thereafter, at a regular board meeting held March 26, 1985, additional petitions containing some 270 names of persons purporting to be registered voters calling for the beer referendum in the City of Clinton were presented for inclusion in the petition. On April 2, 1985, Julia M. Harrison, city clerk, reported to the Mayor and Board that a combination of the purging of 30 names from the registration and poll books plus the addition of 120 registered voters to the petitions brought the number of registered voters signing the petition up to the required 20 percent. The report of the city clerk included the following:
That the number of registered voters within the City of Clinton, Mississippi, on January 15, 1985, totaled 8,190 and the number of registered voters within the City of Clinton, Mississippi, on March 26, 1985, totaled 8,160.

NO. OF NAMES ON PETITIONS VALIDATED NAMES
 2025 1512 (Jan. 15, 1985)
 208 120[*] (March 26, 1985)
 ____ ____
 2233 632

The total list was not validated  120 additional names needed to call for a Referendum.
The Mayor and Board thereupon entered their order directing the holding of an election to determine whether the sale and receipt, storage and transportation for the purpose of sale of beer of an alcoholic content of not more than four percent (4%) by weight within the City of Clinton should be permitted or prohibited.
The special election was held June 4, 1985, and in due course thereafter the Elections Commissioners for the City of Clinton certified to the Mayor and Board the following results:

 FOR THE SALE OF BEER ___________________ 2115
 AGAINST THE SALE OF BEER _______________ 2337

On June 18, 1985, the Mayor and Board of Aldermen met to receive the report of the Elections Commissioners and to adopt an ordinance prohibiting the sale of beer in accordance with the results of the referendum. Exceptors, including C.E. Smith, Appellee here, appeared and charged numerous illegalities in the referendum process, primarily relating to the adequacy of *334 the petition calling the election. Exceptors urged that the City had been without authority to consider the additional names submitted March 26, 1985, and that, in any event, there were 52 names validated which should have been excluded for one of three reasons: The name was not the name of a registered voter in the City of Clinton, the names were signed to a piece of paper which contained no indication on its face that the persons signing it were calling for a referendum on the sale of beer in the City of Clinton, and/or that the names were printed instead of signed. Notwithstanding these exceptions, the Mayor and Board then approved an order prohibiting the sale of beer of an alcoholic content of not more than four percent (4%) by weight in the City of Clinton, Mississippi, effective July 18, 1985.
On June 28, 1985, C.E. Smith filed with the Circuit Court of the First Judicial District of Hinds County, Mississippi, his bill of exceptions, thus timely perfecting his appeal. Costas v. Board of Supervisors of Lauderdale County, 196 Miss. 104, 125-30, 16 So.2d 378, 379-81 (1944). On June 16, 1985, the Circuit Court found that
Irregularities exist in the calling for a beer sales referendum for the City of Clinton and in the subsequent voting upon that issue.
The court thereupon voided the referendum election and the petition calling for same. The order directed the Mayor and Board of Aldermen of the City of Clinton to secure new petitions and to call a new referendum election within ninety (90) days.
The City of Clinton has perfected the present appeal and originally sought reversal of the order of the Circuit Court and reinstatement of its order prohibiting the sale of beer in the City of Clinton.

III.
Our law is not and must never be regarded as an end in and of itself but as a means to positive societal ends. One of those ends is the tolerant accommodation of the conflicting values, beliefs, fears and self-interests of a pluralistic people. We seek to structure and administer our law that we be enabled better to live and let live. This being so, rather than deliver an arid legal opinion, we regard it as appropriate that we have in mind that ambiguous slice of life implicated in today's controversy.[2]
This case is but the latest in our people's seemingly unending struggle over the sale and consumption of alcoholic beverages. Few issues have so tested our fidelity to law, nor presented greater tensions within our law's capacity to accommodate the will of the majority with respect for the privacy, integrity and sensibilities of the individual. We have expended untold quantities of time, energy, oratory and money battling the bottle,[3] and as this case makes clear the end is not in sight. The lessons of three thousand years of the history of Western civilization are at least two: (1) that strong drink will be consumed by our people in varying quantities regardless of what the law may provide and (2) that such consumption will, as it always has, disturb us and our neighbors in forms ranging from inconvenience to tragedy, which from time to time will motivate some to employ the law to ban it.
The spirit besieged today has long been with us. In Xenophon's Anabasis penned in 398 B.C. we find these words:
They had beer to drink, very strong when not mixed with water, but agreeable to those accustomed to it.
Beer has had its poetic defenders over the centuries. We recall John Still, bishop of *335 Bath and Wells, fellow of Christ's College in the late Sixteenth Century, for his lusty appreciation of "jolly good ale and old" in his poem In Praise of Ale. Of the power of malt, A.E. Housman perceived that
many a peer of England brews livelier liquor than the Muse, and malt does more than Milton can to justify God's ways to man.[4]
Ben Jonson regarded beer an inferior drink. It has always cost less than other alcoholic beverages, and for this reason has enjoyed widespread popularity among working class people and the poor. College students throughout the Western world  from the tables down at Mory's to Heidelberg's Inn of the Three Golden Apples, from the Warehouse to the Crossroads to the End Zone  have had a special affection for beer, the encounter with which is almost a required rite of passage to young adulthood. It has emboldened many a student to olympian sophomoric heights, never to be forgotten nor, 'tis hoped, repeated.[5] This in mind, as well that the scene of today's controversy is a college town, we recall Richard Hovey's tolerant reminder
that God is not censorious when his children have their fling.[6]
More soberly, Thomas Jefferson, almost as famous as a connoisseur of fine wines as he was a political leader and theorist, wrote of beer in 1815:
I wish to see this beverage become common instead of the whiskey which kills one-third of our citizens and ruins their families.
Not even beer always produces harmless endings, as the legal reports of this state and nation, reflecting as they do only the tip of the iceberg, are replete with cases of persons who have imbibed excessively and inflicted serious personal injury[7], wrongful death[8], and engaged in destructive and seemingly senseless criminal activity including murder[9], manslaughter[10], aggravated assault[11], and threats of bodily harm to others[12]. We put our heads in the sand if we ignore the darker side of beer.
The struggle to ban beer and other forms of booze suggests further reflections. Barroom settings and the availability of a choice of physiological aids have provided credible vehicles our poets, playwrights and philosophers have used to penetrate our souls. W.H. Auden begins The Age of Anxiety with four wartime lonelies in a New York bar and by the time Malin watches the sun rise from behind the East River has produced a powerful and prophetic declaration of hope, grounded in the sacrifice of the Christ. Eugene O'Neill employs a like setting as The Iceman Cometh teaches that the "lie of the pipe dream ... [is] what gives life", and confronts the inevitability of death as have few others. Albert Camus chooses an Amsterdam bar in The Fall from which his fallen lawyer, Jean Baptiste Clamence, teaches us that genuine and unreserved personal penitence is the sole valid prerequisite to "the right to judge others".
In more popular mediums, the prime time television series, Cheers and Billy Joel's recent song, "Piano Man", employ the bar-room *336 genre to make us laugh, cry and understand life. Without these and so many others, we would be the poorer. Yet we are poorer for the hardship, misery, crime and tragedy occasionally the proximate result of excessive consumption of alcoholic beverages. Our experience with strong drink is as rich with complexity and ambiguity as it is inevitable.
Our law is the witness and external deposit of the values and culture of our society. Pharr v. State, 465 So.2d 294, 297 (Miss. 1984). Seldom has our law attempted to regulate an area of our lives where our values have been so in conflict. The best known expression of that value conflict in this state is the 1952 Whiskey Speech of former Circuit Judge Noah S. Sweat, Jr., of Corinth. That speech blends the sober with the delightful and bears recitation in its entirety.
My Friends:
I had not intended to discuss this controversial subject at this particular time. However, I want you to know that I do not shun controversy. On the contrary, I will take a stand on any issue at any time, regardless of how fraught with controversy it might be. You have asked me how I feel about whiskey. All right, here is how I feel about whiskey ...
If when you say whiskey you mean the devil's brew, the poison scourge, the bloody monster, that defiles innocence, dethrones reason, destroys the home, creates misery and poverty, yea, literally takes the bread from the mouths of little children; if you mean the evil drink that topples the Christian man and woman from the pinnacle of righteous, gracious living into the bottomless pit of degradation, and despair, and shame, and helplessness, and hopelessness, then certainly I am against it.
But,
If when you say whiskey you mean the oil of conversation, the philosophic wine, the ale that is consumed when good fellows get together, that puts a song in their hearts and laughter on their lips, and the warm glow of contentment in their eyes; if you mean Christmas cheer; if you mean the stimulating drink that puts the spring into the old gentleman's step on a frosty, crispy morning; if you mean the drink which enables a man to magnify his joy, and his happiness, and to forget, if only for a little while, life's great tragedies, and heartaches, and sorrows; if you mean that drink, the sale of which pours into our treasuries untold millions of dollars, which are used to provide tender care for our little crippled children, our blind, our deaf, our dumb, our pitiful aged and infirm; to build highways and hospitals and schools, then certainly I am for it.
This is my stand. I will not retreat from it. I will not compromise.[13]
Informed by these thoughts, we proceed to our institutional responsibility: the right interpretation and application of our law regarding beer sales referendum elections.

IV.
Before we consider the merits of this appeal, a preliminary procedural matter requires our attention.
Long after the present appeal had been perfected and even after all briefs had been filed and the case scheduled for oral argument, the City of Clinton on February 20, 1986, moved to dismiss its appeal. In its motion to dismiss the City represented to the Court "that the duly elected governing authorities of the City of Clinton have determined that the City of Clinton should not prosecute this appeal."
The following day, February 21, 1986, Dickey King, Lamar Goff, and Tom Box moved the Court for permission to intervene as appellants and sought leave to prosecute the appeal through final adjudication. King is a member of the Board of Aldermen who the record reflects has supported *337 prohibition of the sale of beer throughout, but King appears here in his individual capacity as a citizen and taxpayer. Goff and Box apparently have no official capacity within the City of Clinton and seek to intervene as citizens and taxpayers. Appellee, C.E. Smith, strenuously opposes the intervention and has filed his own motion to dismiss asserting that the official determination by the Mayor and Board of Aldermen of Clinton that this appeal should be dropped renders the entire matter moot.
The point is covered by our statute law. Miss. Code Ann. § 11-51-105 (1972)[14] provides that, where a governing authority such as the original Appellant here, declines to proceed further with an appeal, interested citizens and taxpayers may of right intervene and, upon posting bond, they may prosecute the appeal to its conclusion, provided only that they be liable for costs in the event the appeal is ultimately unsuccessful.
The purpose and wisdom of this statutory procedure are obvious in a case such as this. There may be any number of reasons why a governing authority may determine to drop an appeal  unwillingness to absorb further costs, a change of political policy, etc. Such a determination has the potential for thwarting the will of the people and for precluding consideration by this Court of important legal questions which the public interest demands be decided. Here dismissal would deprive the 2337 who voted to ban beer sales in their community the right to have the legality of the June 4, 1985 referendum process adjudicated in this Court. If intervention not be allowed, the order of the Circuit Court would, in effect, be affirmed by default.
For these reasons, the motion of the City of Clinton to dismiss the appeal is denied. The motion of Dickey King, Lamar Goff, and Tom Box, citizens and taxpayers of the City of Clinton, Mississippi, for leave to intervene as appellants in this matter is granted. The motion to substitute counsel incident to the intervention of King, Goff and Box is granted. The City of Clinton is retained as a party to this appeal so that it may be subjected to the mandate of this Court; otherwise, it and its counsel are relieved of all further responsibilities for the prosecution of this appeal.

V.
Our law regulates our conduct. It modifies our behavior. It accommodates our conflicting interests. When we employ law to these ends in an area of life, as here so rich in historical conflict, ambiguity, passion and divergent perceptions of the right, its servicability is severely tested. Ofttimes the most we may hope to achieve is a regime of procedural fairness.
Our legislature had procedural fairness among its foremost goals as it in 1950 enacted what has become Miss. Code Ann. § 67-3-9 (1972). The legal structure within which this controversy must be adjudged has been provided in that legislative enactment. Legality of the sale of beer in a municipality of over 2,500 population may be determined in an election. Before the governing body of any such municipality has authority to call any such election, it must receive petitions "containing the names of twenty per centum (20%) of the duly qualified voters of such city asking for such election". Miss. Code Ann. § 67-3-9 (1972).
If such petitions are received, the election "shall be ordered", provided there has been no such election within the preceding five years and providing further that thirty days' public notice of the election shall be *338 given. The statute further mandates that the municipality's governing body shall enact such ordinance as may be appropriate to implement the will of the citizenry as expressed in the election.
Many of the conditions provided in Section 67-3-9 have been met. The City of Clinton qualifies as a city of "not less than two thousand, five hundred (2,500) according to the latest federal census".[15] No beer sales referendum had been held within the preceding five years. The thirty days notice of election was given. At issue is whether the Mayor and Board of Aldermen had presented to them petitions containing in the aggregate the names of twenty percent (20%) of Clinton's qualified voters in the manner and form required by law.
One major bone of contention between the parties is whether the petitions filed January 15, 1985, could be supplemented. The record reflects that on January 15, 1985, there were 8,190 registered voters in the City of Clinton. The petitions that day submitted to the Mayor and Board of Aldermen contained 2,025 signatures. When these names were checked against the voter registration books for the City, however, it became apparent that only 1512 of the signatures could be validated and the city clerk reported this fact to the Mayor and Board. This left the petitioners 126 registered voters short of the statutorily required twenty percent necessary to call the beer sales referendum.
Lee County Drys v. Anderson, 231 Miss. 222, 95 So.2d 224 (1957) states that, upon receipt of a beer sales referendum petition,
[i]t was the duty of the Mayor and Board of Aldermen to canvass the names on the petition in order to determine whether or not such petition contained the required number of qualified voters, and to adjudicate this fact.
231 Miss. at 229-30, 95 So.2d at 226.
Nothing in Lee County Drys, however, resolves today's question whether, upon discovery, that the petitions fall short of the required twenty percent (20%) of registered voters, the mayor and board may afford petitioners a reasonable opportunity to supplement their petitions before the required adjudication is made.
The minutes reflect that the Board was uncertain what it should do regarding the January 15 petitions. Acceding to a suggestion made by an audience spokesman for petitioners, the Board determined to request an opinion from the Attorney General of the State of Mississippi on the question of whether the petitions on file could be supplemented with signatures of additional registered voters. Following release of that opinion on February 19, 1985, petitioners began gathering additional names, and at a meeting held March 26, 1985, petitions containing an additional 207 names were presented, 126 of which were validated. The Board then adjudged that the petitions met the twenty percent requirement and called the election.
Specifically at issue is the authority of the Board to consider the 126 names submitted on March 26, 1985, and certified by the clerk as being those of registered voters. In the context of the facts of the case at bar, we consider that the Board handled the matter correctly.
We have no prior case addressing the precise point in a legally analogous factual context. We have several cases dealing with the question whether petitions may be supplemented in situations where petitions must be filed by a specified time deadline. See Validation of Road and Bridge Bonds, 242 Miss. 125, 133 So.2d 267 (1961); and Coleman v. Board of Supervisors of Choctaw County, 216 Miss. 867, 63 So.2d 533 (1953). In each of these cases the governing authority advised of its intent to issue bonds unless petitions bearing a requisite number of signatures were filed by a specified date. Obviously petitions could be supplemented until the deadline was reached, but not thereafter. These cases are of little benefit in the present context where no time deadline for the filing of the *339 petition for a beer sales referendum in Clinton, Mississippi, existed.
The advice of the Attorney General in this matter was correct. If petitions are presented for final adjudication, and the Mayor and Board of Aldermen adjudge that they do not contain in the aggregate the statutorily required number of signatures of registered voters, the matter is at an end with respect to those petitions, subject, of course, to any rights of appeal from the order of the Mayor and Board. Those rights, however, would necessarily be restricted to the signatures and petitions then before the Mayor and Board.
Here, on the other hand, we consider that the only fair interpretation of the minutes of the Mayor and Board is that, upon receiving the report of the city clerk, the Board was uncertain what it should do and what its authority might be. Clearly the Board had no authority at that time to call a beer sales referendum election. It seems equally clear to us that the Board was well within its prerogatives to take no final action regarding the matter and request an Attorney General's opinion regarding its authority. We refuse to accept the argument of Appellee Smith that, by acknowledging the likely correctness of the city clerk's advice that the petitions were 126 names short of the required twenty percent, the Board finally adjudicated that the petitions were insufficient. We hold that the 126 signatures of registered voters submitted May 25, 1985, were not excluded from consideration because they were submitted subsequent to the January 15 petition filings.
In holding that in the present factual context petitions such as these may be supplemented by additional signatures of registered voters, we in no way imply that such matters may be left open indefinitely. The supplementation must take place within a reasonable time following the filing of the original petitions. Each passing day increases the possibility of a lack of integrity in the original list. Persons who signed the original petitions may have, before the supplemental petitions are received and considered, died, moved away, or simply changed their minds. When, as we here authorize, a governing authority is considering petitions filed at two different times, it must ascertain the integrity of the list of petitioning registered voters as of the date the petitions are adjudged sufficient to mandate the calling of the election.
That there may be no misunderstanding about the matter, we hold that, where no express deadline for the filing of the petitions is fixed by statute or order of the governing authority, additional signatures of registered voters may be added after the original filings if that be done within a reasonable time following the original filings and provided further that the governing authority be required to adjudge as of the date it determines to call the election that the number of validated signatures as of that day is adequate. Where, as here, the delay was some two months and ten days, several weeks of which were consumed in the effort to obtain an opinion from the Attorney General, we hold that none of the 126 signatures submitted March 25, 1985, and validated by the city clerk, was disqualified from consideration because of tardy filing.

VI.
Appellee Smith urges that the petitions are deficient in another respect. He points to the fact that six of the pages, on which appear the validated signatures of 45 qualified electors, contain no indication thereon that the persons signing were aware that they were calling for a beer referendum in the City of Clinton. Smith's argument is that, before the names may be counted toward the statutorily required twenty percent (20%), each signature must be on a sheet of paper which contains language making it clear that the individual knew what he was signing and that he intended to join in the call for the beer referendum.
The record reflects that the overwhelming majority of the 155 pages signed by petitioning voters are headed with preprinted language as follows:

*340 PETITION
The following persons, registered voters in the City of Clinton, Hinds County, Mississippi, pursuant to Section 67-3-9 Mississippi Code 1972, as amended, petitions the Mayor and Board of Aldermen to hold an election to determine whether the sale of beer should be prohibited within the city limits of the City of Clinton, Hinds County, Mississippi.
Persons signing their names below such language are advised of what they are signing and by their signatures manifest their intent that the City call an election.
On the other hand, the record contains six pages containing certified signatures which, other than the signatures, are blank pages. These pages contain no language, preprinted or otherwise, in any way indicating that the signatories were advised of what they were signing or indicating the desire of the person signing to call a beer referendum. These include:

 Page No. Number of Signatures
 9 30
 16 3
 19 7
 132 1
 133 2
 134 2
 __
 45

As is readily apparent, if 45 names are excluded from the total certified, the number of legally effective registered voters' signatures on the petitions are reduced from 1632 to 1587.[16] The number of registered voters in the City being 8,160, the petitions contain the signatures of only 19.45 percent of the registered voters in the City of Clinton, Mississippi, on March 26, 1985.
The matter of what language must appear upon a signed petition calling for a referendum was addressed in Stennis v. Board of Supervisors of Clay County, 232 Miss. 212, 98 So.2d 636 (1957). There we held that no technical form of language must be employed. The wording of the petitions are to be given a fair and reasonable interpretation, recognizing that they have likely been drafted by laymen and not lawyers. So long as they reflect "a clear intention to obtain a local option election", the petitions are sufficient to vest the local governing authority with jurisdiction to call the election. Stennis v. Board of Supervisors of Clay County, Mississippi, 232 Miss. at 227-28, 98 So.2d at 641-42. In Stennis the Court upheld the validity of the petitions in part because it was "manifest *341 that no one signing the petitions was misled by their terms". 232 Miss. at 226, 98 So.2d at 642.
It is appropriate that our law provide reasonable safeguards upon the petitioning process to the end that no one will be misled and that the intent of the petitioning parties will be clear. Where, as here, there are six pages containing the signatures of registered voters with no language appearing thereon other than the signatures, addresses and date of signing, we may be comfortable upon neither point: That the signatories were not misled nor that their intent was clearly manifested.
It is impractical that a petition drive seeking in excess of a thousand signatures be conducted with one petitioning document with all pages affixed to each other at all times carried around by hand from one person to the next. Our law wholly sanctions the process by which different sheets are distributed in different areas of a community and then all assembled at the end for presentation to the governing authority. To hold otherwise would be to make the petition and referendum process so cumbersome that it would become as a practical matter unavailable to our citizenry, a result that would thwart the obvious intention of our laws.
On the other hand, where separate pages are distributed and signed individually, we recognize the potential for fraud and abuse; that is, persons might be induced to sign because a friend or neighbor has signed, without having any earthly idea what is being sought. For this reason, we hold that each signature of a registered voter, before that signature may be validated and counted toward the number of signatures required by statute, must appear upon a page which contains language expressing in an intelligible manner the desire of the signing party that a particular referendum election be called, that is, language sufficient that one reading it before signing would not likely be misled as to the effect and import of his or her signature.
In this day of ready accessibility to sophisticated multiple copy and duplicating machines, we consider this a requirement with which those waging a petition drive may easily comply. Indeed, for the most part petitioners did comply, for the great bulk of the signatures submitted to the city clerk appear on pages headed with the language cited above. Inexplicably, that language does not appear on six of the pages containing 45 validated signatures. Those signatures, therefore, may not lawfully be counted toward the legislatively imposed twenty percent (20%) requirement of Section 67-3-9.

VII.
The order of the Circuit Court, after holding void and of no effect the results of the June 4, 1985 referendum went further and directed that
the City of Clinton shall acquire new petitions calling for the beer sales referendum and if a sufficient number of signatures are obtained, the referendum shall be held within ninety (90) days of the date of this order.
In two respects, this portion of the opinion and order exceed the authority of the Circuit Court and must be vacated.
First, nothing in our law mandates that the City of Clinton "shall acquire new petitions", notwithstanding the legal invalidity of the original petitions. The obligations of the City of Clinton are those set forth in Section 67-3-9 which, as explained above, requires that the Mayor and Board of Aldermen shall receive and act upon a new petition or petitions, if any, as may be filed. The statute places upon the City no affirmative obligation to seek out new petitions, nor may the court supplement the statute by imposing any such obligation.
Second, the ninety (90) day time limit must be vacated and declared of no force and effect. Should those who conducted the original petition drive, or, for that matter, any others, desire to present new petitions, they may do so in conformity with Section 67-3-9. They may do so at any time, subject only to the proviso in the *342 statute that the City may have but one election within five years. The election of June 4, 1985, of course, may not be considered as a disqualifying election, for the obvious reason that this referendum election is of no force and effect. Petitioners, new and/or old, may present to the Mayor and Board their petitions under Section 67-3-9 at any time, even though more than ninety days may have elapsed from the entry of the Circuit Court's Order of July 16, 1985, and even though more than ninety days may have elapsed from the entry of the mandate of this Court.
AFFIRMED IN PART; REVERSED AND RENDERED IN PART.
WALKER, C.J., ROY NOBLE LEE, P.J., and DAN M. LEE, PRATHER, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.
HAWKINS, P.J., specially concurs by separate written opinion.
HAWKINS, Presiding Justice, specially concurring:
I concur in the result.
For my part I would have preferred that Part III be omitted from the opinion.
NOTES
[1] See In re Extension of Boundaries of City of Clinton, Mississippi, 450 So.2d 85 (Miss. 1984).
[2] Compare Flood v. Kuhn, 407 U.S. 258, 260-64, 92 S.Ct. 2099, 2100-2103, 32 L.Ed. 728, 732-33 (1922); and Pharr v. State, 465 So.2d 294, 297-99 (Miss. 1984).
[3] A few of our many legal battles fought in a variety of contexts, include Dunagin v. City of Oxford, Miss., 718 F.2d 738 (5th Cir.1983) (challenge to ban on advertising sale of alcoholic beverages); Lee County Drys v. Anderson, 231 Miss. 222, 95 So.2d 224 (1957) (legality of petition for beer sales referendum in Tupelo); and Edmonds v. Delta Democrat Publishing Co., 230 Miss. 583, 93 So.2d 171 (1957) (libel action arising out of statewide liquor legalization referendum).
[4] Housman, A Shropshire Lad, LXII, 91 (1984 ed.).
[5] Sepmeier v. Tallahassee Democrat, Inc., 461 So.2d 193 (Fla.App. 1984), describes the saga of beer drinking streakers at Florida State University "with more courage than assets". 461 So.2d at 194 n. 1.
[6] Hovey, A Stein Song, reprinted in The Stag's Hornbook 143, 144 (McClure ed. 1945).
[7] Hill v. Dunaway, 487 So.2d 807 (Miss. 1986); Griffin v. Holliday, 233 So.2d 820 (Miss. 1970); Bradshaw v. Rawlings, 612 F.2d 135 (3d Cir.1979).
[8] Saxton v. Rose, 201 Miss. 814, 29 So.2d 646 (1947); Hubbard v. Estate of Havlik, 213 Kan. 594, 518 P.2d 352 (1974).
[9] Stevens v. State, 458 So.2d 726 (Miss. 1984); Lambert v. State, 462 So.2d 308 (Miss. 1984); Fairchild v. State, 459 So.2d 793 (Miss. 1984).
[10] Cook v. State, 467 So.2d 203 (Miss. 1985).
[11] Watson v. State, 465 So.2d 1025 (Miss. 1985); Gray v. State, 427 So.2d 1363 (Miss. 1983) and State v. Clements, 383 So.2d 818 (Miss. 1980).
[12] Swanson v. Wesley College, Inc., 402 A.2d 401 (Del.Super. 1979).
[13] Judge Sweat's Whiskey Speech, together with an account of its origins, appear in M. Hughes, Judge Sweat And "The Original Whiskey Speech", The Jurist (Vol. I, No. 2, Spring, 1986) at pp. 16-17.
[14] Miss. Code Ann. § 11-51-105 (1972), in pertinent part, provides:

... [I]n all cases where an appeal is prosecuted by the officer or officers who are parties to the suit and such officer or officers desire to dismiss such appeal, the appeal shall not be dismissed if any taxpayer or taxpayers of the county, municipality or district shall object thereto, but the court shall retain the cause and render decision therein upon the issues presented by such appeal; provided, however, that such taxpayer or taxpayers shall prepay costs as hereafter provided, and shall forfeit all prepaid costs of such appeal should said cause be decided adverse to him or them.
[15] According to the 1980 Census, the population of Clinton was 14,660.
[16] The record before us contains 155 pages of petitions presented to the Mayor and Board of Aldermen including the six pages containing the 45 signatures in dispute. The Bill of Exceptions filed by Appellee Smith in Paragraphs III-VIII set forth the facts upon which the present point is considered.

The record reflects that at the June 18, 1985 meeting of the Mayor and Board of Aldermen, counsel for Appellee Smith made the following statement:
The second area of protest is that on three or four pages of the petitions  at least the ones that I saw  that were so certified by the Clerk, there was no heading entitled what people were putting their names on. I've seen a list passed around tonight in opposition to, I think, a special assessment. Well, it so certifies, at the top, what the purpose of that petition is. On three or four pages, I think, totaling about sixty names, of the names so certified by the Clerk of this City, there was no indication of what the person putting his name on that line was doing. And we would point out to the City that we feel that's a violation of Smith v. State, in the State Supreme Court. Therefore, you've got sixty-some-odd invalid names that you used in saying that you had the percentage necessary to call an election.
The Mayor and Board of Aldermen, of course, rejected this and other objections Smith filed. The point at issue was by virtue of being a part of the Bill of Exceptions necessarily before the Circuit Court. Its order voiding the referendum election merely recites
that irregularities exist in the calling for a beer sales referendum for the City of Clinton and in the subsequent voting upon that issue.
The opinion never specifies what those irregularities were considered to be. Rather, it merely declared that, "The petition calling for the beer sales referendum be void."
On this appeal, the brief originally filed on behalf of the Mayor and Board of Aldermen of the City of Clinton challenges the deletion of those signatures appearing on otherwise blank sheets of paper as a basis for the Circuit Judge's ruling. See Brief of Appellant, filed October 7, 1985, pp. 12-16. Appellee Smith, of course, responded in his brief. In this setting, we have little doubt that the matter is properly before us for review, notwithstanding the absence of an express adjudication in the court below.